AO 451 (Rev. 01/09) Clerk's Certification of a Judgment to be Registered in Another District

# UNITED STATES DISTRICT COURT
for the

ALBERTO JUSTO RODRIGUEZ LICEA,
FERNANDO ALONSO HERNANDEZ, AND
LUIS ALBERTO CASANOVA TOLEDO
_____
                Plaintiff
         v.
CURAZAO DRYDOCK COMPANY INC., A/K/A
CURACAOSE DOKMAATSCHAPPIJ N.V., A/K/A
CDM N.V.
_____
                Defendant

14-mc-01498

Civil Action No. 1:06-CV-22128-JLK

**CLERK'S CERTIFICATION OF A JUDGMENT TO BE REGISTERED IN ANOTHER DISTRICT**

I certify that the attached judgment is a copy of a judgment entered by this court on (date) 10/31/08.

I also certify that, as appears from this court's records, no motion listed in Fed. R. App. P. 4(a)(4)(A) is pending before this court and that no appeal has been filed or, if one was filed, that it is no longer pending.

Date: 3/11/2014

Steven M. Larimore
CLERK OF COURT

_____
Signature of Clerk or Deputy Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 06-22128-CIV-KING/BANDSTRA

ALBERTO JUSTO RODRIGUEZ LICEA,
FERNANDO ALONSO HERNANDEZ, and
LUIS ALBERTO CASANOVA TOLEDO,

    Plaintiffs,

v.

CURAÇAO DRYDOCK COMPANY, INC., a/k/a
CURAÇAOSE DOKMAATSCHAPPIJ NV, a/k/a
CDMNV,

    Defendant.

_____/

14-mc-01498

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____
Date _____ Deputy Clerk

## FINAL JUDGMENT

THIS CAUSE comes before the Court upon a non-jury trial on damages on October 20, 2008.

I.    **INTRODUCTION**

Plaintiffs in this matter sought compensatory and punitive damages for the physical and psychological injuries they suffered, and continue to suffer, as victims of a forced labor scheme through which the Defendant, in concert with and employing the full threat of the totalitarian regime of Fidel Castro, trafficked them to Curaçao and extracted their labor.

The Defendant, the Curaçao Drydock Company, well-aware of the brutal tactics and repressive schemes that the Cuban regime employed to extract forced labor from Cubans, conspired with Cuba to take advantage of that forced labor by hosting an outpost of the Cuban forced labor system in Curaçao. Through the conspiracy, Defendant enabled Cuba to skirt the

U.S. Embargo; meanwhile, the Defendant enjoyed the economic advantage of between 50 and 100 trafficked, captive, forced laborers for a period of approximately 15 years. The three plaintiffs in this case escaped their bondage in Curaçao, and, after being hunted as outlaws, were granted Significant Public Benefit Parole to enter the United States. Their suffering did not end there, however, as their ordeal still haunts them, and as the Cuban state continues to punish them by repressing their families.

## II.   PROCEDURAL HISTORY

On August 24, 2006, Plaintiffs filed this action under the Alien Tort Statute, 28 U.S.C. § 1350 (2000), ("ATS") and the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1962(b) (2000) ("RICO"). The complaint was amended once on January 11, 2007.[1] On March 13, 2007, Defendant filed a motion to dismiss challenging personal jurisdiction, and arguing *forum non conveniens*. However, on September 28, 2007, Defendant filed a notice withdrawing its lack of personal jurisdiction defense, leaving *forum non conveniens* as the only challenge to the Amended Complaint.[2] After briefing and argument on the Defendant's remaining challenge based on *forum non conveniens*, this Court, on February 22, 2008, issued its Order denying Defendant's motion. *See Licea v. Curaçao Drydock Co., Inc.*, 537 F. Supp. 2d 1270 (S.D. Fla. 2008). On March 3, 2008, this Court denied Defendant's Motion for Certificate of Appealability, clearing the way for discovery and trial.

---

[1] The Amended Complaint states claims for forced labor, false imprisonment, negligence and civil RICO.

[2] Defendant did not file a motion challenging the sufficiency of the claims pursuant to F.R.C.P. 12(b)(6).

2

The Defendant repeatedly flouted this Court's authority and refused to defend the matter.[3] As a result, this Court, on August 8, 2008, entered an Order striking Defendant's answer to the Amended Complaint and entering default judgment in favor of the Plaintiffs as to the issue of liability. The Court set the trial on damages to begin on October 20, 2008.

At trial, Plaintiffs presented testimonial and documentary evidence in support of their claims. Because all of Defendant's pleadings had been stricken and the Defendant chose not to defend this matter at trial, this Court accepts as true Plaintiffs' uncontroverted factual allegations from the Amended Complaint, *see, e.g., Thomson v. Wooster,* 114 U.S. 104 (1885); *Nishimatsu Constr. Co. v. Houston Nat'l Bank,* 515 F.2d 1200, 1206 (5th Cir. 1975), as well as their uncontroverted and credible testimony at trial.

### III.  SUBJECT MATTER JURISDICTION

Defendant did not challenge this Court's subject matter jurisdiction. Nonetheless, federal courts have an obligation to ensure that they properly exercise their jurisdiction. *See, e.g., Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94 (1998). Plaintiffs invoked this Court's subject

---

[3] After challenging this Court's authority by first asserting it was not subject to personal jurisdiction, only to later concede the issue once the facts were known, Defendant then refused to produce its representatives for depositions despite direct warnings that such belligerence would result in its pleadings being stricken. On April 17, 2008, Plaintiffs filed a motion to compel deposition dates that was withdrawn on May 14, 2008, when Defendant agreed to have its representatives appear for depositions on June 5–6, 2008. However, on the eve of such depositions, Defendant informed Plaintiffs that its representatives would not appear. On June 9, 2008, this Court attempted to remedy the situation by setting the Defendant's depositions for July 9, 2008, and warned Defendant that if its representatives did not appear, that the Court would strike its pleadings. On the eve of these deposition dates, on July 8, 2008, the Defendant's counsel filed a motion to withdraw, indicating that Defendant was refusing to appear. The Defendant did not seek a protective order. This Court gave Defendant, a corporation, ample time to find new counsel. On July 16, 2008, this Court set a 10-day deadline to obtain new counsel. Defendant failed to do so.

matter jurisdiction pursuant to the Alien Tort Statute, as well as civil RICO, and invoked supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

A.  **ATS Jurisdiction**

There is a split of authority over whether, in invoking subject matter jurisdiction under the ATS, one must plead a merely colorable violation of the law of nations, or whether there is a higher jurisdictional standard for ATS claims that blurs the line between subject matter jurisdiction and the sufficiency of a claim on the merits. *See John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1004–06 (S.D. Ind. 2007) (discussing this split at length before holding that treating the sufficiency of a claim as a jurisdictional requirement is inconsistent with the Supreme Court's guidance in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)).

As is more fully explained in Section IV, the Plaintiffs were trafficked, held in captivity in Defendant's facility in Curaçao and forced to work under threat of the repressive tactics of the Cuban totalitarian state, including, and specifically, imprisonment.[4] Regardless of which jurisdictional standard applies, the forced labor and international human trafficking alleged and proved in this matter clearly constitute violations of universal and obligatory norms of

---

[4] The Cuban state's use of forced labor in violation of international law, and the repressive tactics it employs to extract that labor, are chronicled in the United States Department of State Country Reports for Human Rights Practices for Cuba. While such documents are not evidence when alleged, "they provide a way for a plaintiff to show a court there is likely to be some evidentiary weight behind the pleadings that the court must evaluate" in the 12(b)(6) analysis. *John Roe I*, 492 F. Supp. 2d at 1007. In this case, Plaintiffs alleged clear violations of international law, referencing the documented abuses of the Cuban state generally and its forced labor system specifically; the sufficiency of the claims was not challenged; the allegations were not refuted; and the Plaintiffs provided direct testimony in fact supporting and proving the allegations.

4

international law, thereby constituting actionable claims falling well within the jurisdictional grant of the ATS.[5]

## B. Jurisdiction Pursuant to Civil RICO

The goal of the conspiracy in this matter was to evade the U.S. Embargo on Cuba. The means to this end taken by Defendant was to provide the Castro regime reach and access to the United States ship service and repair market. There are thus plausible grounds to find that the scheme at issue had substantial effects within the United States, thereby triggering jurisdiction pursuant to civil RICO, 18 U.S.C. § 1962. *See Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2006 U.S. Dist. Lexis 72231, at *55 (D.D.C. Sept. 21, 2006) ("The anti-fraud laws of the United States may be given extraterritorial reach whenever a predominantly foreign transaction has substantial effects within the United States.") (quoting *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261–62 (2d Cir. 1989)); *see also Doe I v. Unocal Corp.*, 395 F.3d 932, 961–62 (9th Cir. 2002) (agreeing with the Second Circuit that RICO applies extraterritorially when the claim meets either the "effect" or the "conduct" test). Further, Defendant may have been found to have taken actions within the United States in furtherance of the conspiracy.

---

[5] *See Doe I v. Unocal Corp.*, 395 F.3d 932, 946 (9th Cir. 2002) (stating that forced labor violates law of nations), *vacated on rehearing en banc*, 395 F.3d 978 (9th Cir. 2003), *appeal dismissed*, 403 F.3d 708 (9th Cir. 2005). The plaintiffs in *Doe I v. Unocal Corp.* testified that the Burmese military used both force and threats of force to conscript them to work on Unocal's pipeline and supporting infrastructure. *Doe I v. Unocal Corp.*, 110 F. Supp. 2d 1294, 1298 & n.3 (C.D. Cal. 2003). The district court had found that such evidence showed forced labor in violation of the law of nations, *id.* at 1307–08, and the Ninth Circuit panel agreed, *Doe I v. Unocal Corp.*, 395 F.3d at 945–47, before the appeal was eventually dismissed. See generally *John Roe I*, 492 F. Supp. 2d at 1007 and *Jane Doe I v. Reddy*, C02-05570, 2003 WL 23893010, at *8 (N.D. Cal. Aug. 4, 2003) for discussions of the international norms against forced labor and human trafficking.

However, because the ATS clearly grants this Court jurisdiction over the subject matter of at least one count in this action, civil RICO simply provides an additional basis for jurisdiction.

## IV.   FACTS

### A.   The Conspiracy

The Defendant in this case, one of the largest drydock companies in the Western Hemisphere, with tens of millions if not hundreds of millions of dollars in annual revenues, conspired with the Republic of Cuba to force Cuban citizens to travel to facilities the Defendant owns in Curaçao, to hold them in captivity there, and to force them to work repairing ships and oil platforms. The Defendant knew: that Cuba is a totalitarian state that abuses human rights[6];

---

[6] According to the United States Department of State's report on Cuba from the year of Plaintiffs' escape:

> Cuba, with a population of 11 million, is a totalitarian state led by a president, Fidel Castro, whose regime controls all aspects of life through the Communist Party (CP) and its affiliated mass organizations, the government bureaucracy, and the state security apparatus. Although civilian authorities generally maintained effective control of the security forces, the Ministry of Interior is the principal instrument of state security and control, and officers of the Revolutionary Armed Forces, which are led by the president's brother, have occupied most key positions in the ministry during the past 15 years.
>
> The government's human rights record remained poor, and the government continued to commit numerous, serious abuses. At least 333 Cuban political prisoners and detainees were held at year's end. The following human rights problems were reported:
>
> *   denial of citizens' rights to change their government
> *   beatings and abuse of detainees and prisoners, including human rights activists, carried out with impunity
> *   transfers of mentally healthy prisoners to psychiatric facilities for political reasons
> *   frequent harassment of political opponents by government-recruited mobs
> *   extremely harsh and life-threatening prison conditions, including denial of medical care

that Cuba has a long history of forced labor and routinely compels labor under threat of imprisonment in violation of international law; that any Cuban who resists performing work is subject to persecution[7]; that Cuba imposes prosecutions or "therapy and reeducation"[8] at police discretion for the crime of "potential dangerousness" on those who refuse to work for the socialist cause[9]; that Cuba imprisons those who refuse to work at worksites[10] in prisons that are

---

* arbitrary arrest and detention of human rights advocates and members of independent professional organizations
* denial of fair trial, particularly to political prisoners
  interference with privacy, including pervasive monitoring of private communications
* severe limitations on freedom of speech and press
* denial of peaceful assembly and association
* restrictions on freedom of movement, including selective denial of exit permits to thousands of citizens
* refusal to recognize domestic human rights groups or to permit them to function legally
* domestic violence, underage prostitution, and sex tourism
* discrimination against persons of African descent
* severe restrictions on worker rights, including the right to form independent unions

*See* Bureau of Democracy, Human Rights, and Labor, *Country Reports for Human Rights Practices, 2005, Cuba* (2006), http://www.state.gov/g/drl/rls/hrrpt/2005/61723.htm. This and the other excerpts to this report cited herein were alleged in the uncontroverted Amended Complaint.

[7] The United States Department of State reported:

> [Cuban] law provides that all legally recognized civil liberties may be denied to anyone who actively opposes the decision of the people to build socialism.

*See id.*

[8] The terms "therapy and reeducation" refers not to any positive rehabilitation, but rather to violent treatment in Castro's dismal prisons.

[9] The United States Department of State reported:

particularly inhumane and dangerous[11]; that Cuba employs outrageous means to persecute those who resist the will of the state; that the Cuban state was particularly concerned with the laborers it was deploying to Curaçao because they generated hard currency; that the punishment workers

---

> The [Cuban] Penal Code includes the concept of "potential dangerousness," defined as the "special proclivity of a person to commit crimes, demonstrated by his conduct in manifest contradiction of socialist norms." If the police decide that a person exhibits signs of dangerousness, they may bring the offender before a court or subject him to therapy or political reeducation. Government authorities regularly threatened prosecution under this provision.

See id.

[10] The United States Department of State reported:

> The law does not prohibit forced or compulsory labor by adults. The government maintained correctional centers for persons convicted of such crimes as "dangerousness" (see section 1.a.). Prisoners held in such centers were forced to work on farms or at sites performing construction, agricultural, or metal work. The authorities also often imprisoned persons sent to work sites who refused to work.

See id.

[11] The United States Department of State reported:

> Prison conditions continued to be harsh and life threatening. Conditions in detention facilities also were harsh. Prison authorities frequently beat, neglected, isolated, and denied medical treatment to detainees and prisoners, particularly those convicted of political crimes or those who persisted in expressing their views. Authorities also often denied family visitation, adequate nutrition, exposure to natural light, pay for work, and the right to petition the prison director.
>
> Prisoners sometimes were held in "punishment cells," which usually were located in the basement of a prison, with continuous semi-dark conditions, no available water, and only a hole for a toilet. Reading materials, including Bibles, were not allowed. Prison officials regularly denied prisoners other rights, such as the right to correspondence. Some prison directors routinely denied religious workers access to detainees and prisoners.
>
> In November the Cuban Commission for Human Rights and National Reconciliation denounced the worsening health of dozens of political prisoners, stating that more prisoners suffered from dangerous diseases due to the "generally subhuman and degrading conditions" in which they were held.

See id.

8

would receive if they refused to work in its forced labor program would be particularly harsh because the program generated foreign currency that allowed the state to survive economic sanctions on it; and that the laborers provided by Cuba were not free individuals.

The Defendant put Manuel Bequer, Fidel Castro's nephew, on its payroll as Production Manager at the drydock facility in Curaçao, thereby leaving no doubt that it was employing, and making its agent, the coercive Castro regime. It also leaves no doubt that Defendant knew, through its employee Manuel Bequer, the workings of the Cuban totalitarian state discussed above. Manuel Bequer held his position with Defendant because of his ability to commandeer forced Cuban labor under color of authority of the Cuban state. The Defendant hosted members of the Cuban state security apparatus on its premises to oversee the forced laborers, who watched and threatened the laborers to prevent them from escaping and to extract labor from them. The Defendant also took direct measures to ensure that the laborers did not escape, including keeping them in a secure area, watching them and hiring security personnel to monitor them.

### B. Plaintiffs' Testimony Concerning Their Suffering and Injuries

Plaintiffs testified credibly at trial to the intimidation they felt upon being ordered to go to work for the Defendant; the fact that if they refused, they faced persecution and imprisonment; the fact that they were told that their work was of utmost importance to the Castro regime because it was a means for the regime to generate U.S. currency and thereby break the U.S. Embargo; the fact that their passports were taken upon arrival in Curaçao; the fact that they were held in captivity at the Defendant's facility in Curaçao; the fact that they were ordered to work 16 hour days for up to 45 days straight; the fact that Defendant forced them to perform dangerous and physically demanding work cleaning, repairing and painting ships and oil

platforms; the fact that Defendant did not provide for their safety, resulting in injuries to all three of them.

Each Plaintiff testified to significant and painful physical injuries. Plaintiff Fernando Alonso Hernandez testified to an injury to his hand. He was welding, and, because Defendant failed to provide him with proper safety equipment, fuel flooded his glove and caught fire. He did not receive proper medical care. He was forced to peel burnt flesh off of his hand down to the bone and ligaments when he changed his own homemade bandages.

Plaintiff Alberto Justo Rodriguez Licea testified that he suffered a fall down several stories along the side of a ship when substandard equipment suspending him broke in or around June 2002. He broke his foot and ankle badly. He did not receive proper medical care. In fact, Defendant left him on the ground for hours in pain and then shipped him back to Cuba (the forced laborers were kept outside of the legal and regulatory systems in Curaçao). He was never properly treated and still suffers from this injury.

Plaintiff Luis Alberto Casanova Toledo testified to an electric shock in December 2004. At 5:00 a.m. one morning, near the end of one of his 16-hour shifts, he was ordered to enter tight quarters on a ship and work in water. Defendant was employing 220-volt electricity in the area against safety norms, and Mr. Casanova experienced a shock so severe that the electricity shot out his tongue, leaving him bleeding from it. Defendant ordered Mr. Casanova Toledo, still recovering from the shock and with blood streaming down his mouth and soaking his shirt, back to work to finish the last hours of his 16-hour shift.[12]

---

[12] These physical injuries occurred within years of humiliation, deprivation and suffering testified to by Plaintiffs, exemplified by the following. Plaintiffs were captive and were not properly fed by Defendant. They lived in inhumane barracks like slaves. They had no liberty. They could not walk off the premises of Defendant's drydock facility except on special occasions when they had Cuban government security agents monitoring them. After working

These physical injuries contributed to the psychological injuries Plaintiffs suffered. Defendant's greed caused Plaintiffs to be torn from their families and placed them in an impossible dilemma: either suffer the fate of forced laborers in a foreign land in effect serving a hard-labor prison sentence with no end, or risk their lives to escape, which meant never seeing their loved ones again and triggering their loved one's persecution by the Cuban state. Ultimately, Plaintiffs could not take their treatment anymore, and in late 2004 and early 2005, escaped, risking their lives, imprisonment, persecution of their families and being denied ever seeing their families again. Their experience was harrowing. Defendant hired security agents who distributed photos of them and stated that they were dangerous, escaped prisoners who were wanted "Dead or Alive." Plaintiffs made their way to Colombia, which granted them asylum, but they were pursued there. Still fearing for their lives, Plaintiffs went to a United States Embassy and, on February 8, 2006, the U.S. Government granted each of them a Significant Benefit Parole to enter the United States.

Plaintiffs continue to suffer both from being separated from their loved ones and knowing that the Defendant's co-conspirator is punishing their families. Plaintiff Alberto Justo Rodriguez Licea testified that he has not seen his now four-year-old son since he was just a few months old. Plaintiff Fernando Alonso Hernandez has not seen his three children. Plaintiff Luis Alberto Casanova Toledo is now isolated from his family. The families of all the Plaintiffs suffered and

---

16-hour days for 15, 30 or even 45 consecutive days, Plaintiffs were not allowed to rest, but rather were forced to stay on Defendant's premises and, while still physically exhausted from working, to watch videotapes of Fidel Castro's rambling, hours-long speeches extolling the virtues of the Revolution. This abuse is a telling detail. In forcing Plaintiffs to watch these videotapes, Defendant and/or its agents and co-conspirators intended to humiliate and debase Plaintiffs, force them to act against their will and conscience, incite their fear and anguish, and break their physical and moral resistance. This treatment highlighted the fact that Defendant was host to an outpost of the Cuban totalitarian state's forced labor camp system.

continue to suffer repression because Plaintiffs exposed the conspiracy between Cuba and Defendant. Each of the Plaintiffs testified to the repressive tactics employed against themselves and their families. The catalog of repressive measures that have been visited upon the Plaintiffs' families as punishment for exposing the forced labor conspiracy between Defendant and the Cuban regime is long. For example, brothers and spouses have lost their jobs, children have been denied schooling, and angry mobs have demonstrated outside their homes in acts of "repudiation."

The Plaintiffs also testified to their ongoing depression, anxiety and health problems. For example, Alberto Justo Rodriguez Licea testified that he had nightmares and wakes up thinking that he is in jail in Cuba. Luis Casanova Toledo likewise testified to nightmares, as well as ulcers. Fernando Alonso Hernandez testified that he starts crying every time he is alone. All three testified movingly to the hardships they suffered and continue to suffer due to prolonged absences from their families.[13]

The Plaintiffs also introduced documentary evidence supporting their histories. Photographs of the Defendant's facilities verified the large size of the operation. The Defendant's own web pages confirmed Manuel Bequer's management role. The photos Defendant and its agents used while hunting Plaintiffs were introduced. Finally, Plaintiffs introduced the agreement between the Defendant and a Cuban state entity that directly stated the debt Cuba owed, and related the fact that the debt would be paid with labor, the forced labor that Plaintiffs provided.

---

[13] Plaintiffs' injuries were comparable in that they each suffered the fate of forced laborers. However Plaintiff Fernando Alonso Hernandez testified to 9 tours of forced labor, as compared to three each for the other two Plaintiffs. Further, he suffered more serious and disfiguring injuries. These differences are reflected in the final damage award.

Given the overwhelming and uncontroverted evidence in this matter, Plaintiffs certainly proved their claim to both compensatory and punitive damages. The only remaining issue is determining the amount of those damages.

## V. DAMAGES UNDER THE ATS AND RELATED HUMAN RIGHTS CASES INVOLVING CUBA

Federal district courts attempting to quantify damages in ATS and related Torture Victim Protection Act ("TVPA") cases have commented on the conceptual difficulty of quantifying damages for human rights abuses.[14] In *Mushikiwabo v. Barayagwiza*, No. 94 CIV 3627, 1996 WL 164496 (S.D.N.Y. 1996), a case where the Court was asked to award damages to five Rwandan Tutsi plaintiffs after the grant of default judgment against a Rwandan Hutu military leader, the Court observed:

> [o]ne cannot place a dollar value on the lives lost as the result of the defendant's actions and the suffering inflicted on the innocent victims of his cruel campaign.

*Mushikiwabo*, 1996 WL 164496, at *2.

As that Court said, however, "a monetary judgment is all the Court can award these plaintiffs" and went on to award each plaintiff $500,000 in compensatory damages and $1 million in punitive damages for each relative killed, plus an additional $5 million in punitive damages for each plaintiff. *Id.* Fact finders in the Eleventh Circuit have likewise consistently awarded significant compensatory and punitive damages to ATS and TVPA plaintiffs. *See, e.g., Arce v. Garcia*, 434 F.3d 1254, 1256 (11th Cir. 2006) (awarding three Salvadoran plaintiffs $54

---

[14] Both the ATS and the TVPA concern only the most serious violations of international law, a short list which includes piracy, genocide, torture, extrajudicial killing, and slavery and the slave trade, and their modern incarnations, forced labor and human trafficking. The TVPA, 28 U.S.C. § 1350 note (2000), is a later amendment to the ATS. For purposes of a damages assessment in this matter, it is appropriate to look to both ATS and TVPA cases because they also concern violations of fundamental human rights norms.

13

million in cumulative compensatory and punitive damages after contested trial); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1151 (11th Cir. 2005) (awarding four Chilean plaintiffs $3 million each in compensatory damages and $1 million in punitive damages after contested trial); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322 (N.D. Ga. 2002) (awarding four Bosnian Muslim plaintiffs $10 million each in compensatory damages and $25 million each in punitive damages after bench trial on merits with defendant in absentia); *Paul v. Avril*, 901 F. Supp. 330, 336 (S.D. Fla. 1994) (awarding six Haitian plaintiffs between $2.5 million and $3.5 million each in compensatory damages and $4 million each in punitive damages after default judgment and hearing on damages).[15]

In making these damage awards, fact finders take a number of different factors into consideration. The court in the Eastern District of California recently surveyed the existing case law on compensatory and punitive awards under the ATS and TVPA and concluded that fact finders typically consider six factors in awarding such damages:

1. Brutality of the act;
2. Egregiousness of defendant's conduct;
3. Unavailability of criminal remedy;
4. International condemnation of act;

---

[15] In addition to the cited cases from the Eleventh Circuit, numerous cases from other circuits have made similar significant compensatory and punitive damages awards in ATS and TVPA cases. *See, e.g., Chavez v. Carranza*, 413 F. Supp. 2d 891 (W.D. Tenn. 2005) (entering final judgment on Jan. 18, 2006 and awarding four out of five plaintiffs $500,000 each in compensatory damages and $1 million in punitive damages); *Doe v. Saravia*, 34 F. Supp. 2d 1112, 1158 (E.D. Cal. 2004) (awarding $5 million in compensatory damages and $5 million in punitive damages); *Tachiona v. Mugabe*, 234 F. Supp. 2d 401, 441 (S.D.N.Y. 2002), *overruled on other grounds*, 386 F.3d 205 (2d Cir. 2004) (awarding collective compensatory damage award of $20.2 million and punitive damage award of $51 million); *Xuncax v. Gramajo*, 886 F. Supp. 162, 197–99 (D. Mass 1995) (awarding plaintiffs between $500,000 and $3 million each in compensatory damages and between $500,000 and $5 million each in punitive damages); *Filartiga v. Pena-Irala*, 577 F. Supp. 860, 867 (E.D.N.Y. 1984) (awarding plaintiffs, in the seminal ATS case that was ultimately validated by the Supreme Court, between $175,000 and $210,000 each in compensatory damages and $5 million each in punitive damages).

      5. Deterrence of others from committing similar acts; and
      6. Provision of redress to plaintiff, country and world.

*Doe v. Saravia*, 348 F. Supp. 2d 1112, 1158 (E.D. Cal. 2004). Courts in the Eleventh Circuit have historically considered some combination of these factors when making awards. *See, e.g., Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1358 (N.D. Ga. 2002) (brutality, egregiousness, deterrence); *Paul v. Avril*, 901 F. Supp. 330, 336 (S.D. Fla. 1994) (egregiousness, international condemnation); *Abebe-Jiri v. Negewo*, No. 1:90-CV-2010-GET, 1993 WL 814304, at *4 (N.D. Ga. Aug. 20, 1993), *aff'd* 72 F.3d 844, 847 (11th Cir. 1996) (finding that plaintiffs were entitled to "compensatory damages sufficient to compensate for all physical and nonphysical injuries caused by the illegal act and punitive damages sufficient to punish the defendant and deter future violations."). Finally, it is worth noting that in each of the above cases, the defendant was an individual who could likely be effectively punished and deterred by a smaller award than a large business enterprise.

    There is a second prism through which to view the damages in this case—through the damage awards given in cases concerning abuses of the Cuban totalitarian regime. Courts have long compensated for and punished abusive acts taken by the Cuban government with significant damage awards. *See, e.g., Alejandre v. Republic of Cuba*, 996 F. Supp. 1239, 1253 (S.D. Fla. 1997) (citing long line of large awards in ATS cases in awarding $187.6 million award against Republic of Cuba for aircraft shootdown).

    The awards in the above cases inform the Court and put the analysis of compensatory and punitive damages in this case in perspective.

    **A.**    **Compensatory Damages**

    Physical and psychological injuries such as are apparent in this case can result in significant compensatory damages. In *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1358 (N.D.

Ga. 2002), the Northern District of Georgia awarded four Bosnian Muslim plaintiffs compensatory damages of $10 million each in their ATS and TVPA case against a Serbian guard who detained and tortured them for a protracted period in a concentration camp. In *Mehinovic*, the court noted that the compensatory damage award was appropriate "in light of the gravity of the abuses involved and the serious physical and psychological injuries cause by acts such as those suffered by plaintiffs." *Id.* The *Mehinovic* court described with particularity the various physical and psychological injuries incurred by plaintiff and noted that they were "entitled to damages for a broad range of physical, emotional, and social harms." *Id.* at 1359. For example, the *Mehinovic* court found substantial harm shown by one plaintiff's testimony about the psychological effects of prolonged separation from his wife and newborn child and becoming a stranger to his own daughter. *Id.* The court found testimony from all of the *Mehinovic* plaintiffs regarding their "nightmares, difficulty sleeping, flashbacks, anxiety, difficulty relating to others, and feeling abnormal" to be a valid basis for significant compensatory damage awards. *Id.*; *see also Paul v. Avril*, 901 F. Supp. 330, 336 (S.D. Fla. 1994) (awarding $2.5 million–$3.5 million per plaintiff for, *inter alia*, severe pain and suffering). Courts have also emphasized the "grievous nature" and "severity" of the harm to plaintiffs when considering the appropriate amount of compensatory damages. *See Xuncax v. Gramajo*, 886 F. Supp. 162, 198 (D. Mass. 1995).

As Plaintiffs in the present case testified, the extreme brutality of the Defendant's actions resulted in severe psychological damage. It is hard to imagine what it feels like to be forced into servitude. It is even harder to imagine the emotions Plaintiffs suffer from knowing that their families are being punished. But there is no doubt that the severe, ongoing physical and

damages. Such an award will act as a deterrent, and will reflect the international revulsion against international human trafficking and forced labor.

## VI. JUDGMENT

For the foregoing reasons, and based on undisputed facts in this case and the testimony at trial, it is:

ORDERED, ADJUDGED, and DECREED that judgment is hereby entered against Defendant as follows:

1) Alberto Justo Rodriguez Licea

   $15 million in compensatory damages; and

   $10 million in punitive damages;

2) Fernando Alonso Hernandez

   $20 million in compensatory damages; and

   $10 million in punitive damages;

3) Luis Alberto Casanova Toledo

   $15 million in compensatory damages; and

   $10 million in punitive damages.

Post-judgment interest will accrue at the rate set by 28 U.S.C. § 1961 (2000).

DONE and ORDERED in chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida this 31st day of October, 2008.



JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc:

### Counsel for Plaintiffs
Stuart Grossman
Seth Miles
Grossman Roth, P.A.
2525 Ponce de Leon Blvd., Suite 1150
Coral Gables, Florida 33134

John Thornton
Orlando do Campo
do Campo & Thornton, P.A.
100 Southeast Second Street, Suite 2700
Miami, Florida 33131

### Defendant
Curaçao Drydock Company, Inc.
Attn: Frank Esser, Managing Director
Dokweg 1, Koningsplein
P.O. Box 3012
Curaçao, Netherlands Antilles